IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 17, 2012

## STATE OF TENNESSEE v. CLARK BEAUREGARD WATERFORD, III

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2637      J. Randall Wyatt, Jr., Judge**

**No. M2011-02379-CCA-R3-CD - Filed May 30, 2013**

The Defendant, Clark Beauregard Waterford, III, was indicted for first degree premeditated murder. Following a jury trial, the Defendant was convicted of the lesser-included offense of second degree murder and sentenced to forty years as a Range II, multiple offender. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his conviction for second degree murder; (2) that the trial court erred in deciding that the Defendant's two prior convictions for aggravated assault would have been admissible for impeachment purposes if the Defendant had decided to testify at trial; and (3) that the trial court erred by imposing the maximum sentence. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and J. Michael Engle, Assistant Public Defender (at trial), for the appellant, Clark Beauregard Waterford, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Victor S. Johnson, III, District Attorney General; Katrin Novak Miller and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

FACTUAL BACKGROUND

At approximately 6:00 a.m. on May 11, 2010, Clayton Harris found the body of the victim, Faye Burns, lying in a puddle of blood on her bedroom floor next to her bed. There were significant amounts of blood on the bed, the floor, and the victim. By the time the police arrived, the blood appeared to be "somewhat coagulated." The victim's shirt and bra had been partially removed, exposing part of her breasts. The victim's pants were still on, but they had been "unbuttoned and unzipped." The room appeared to be in disarray, as if there had been some kind of struggle. Various objects had been knocked over, items were scattered across the floor, and there was some broken glass on the floor. A knife and a glass ashtray were found in the bedroom. The knife was clean and had no blood or fingerprints on it. A change purse was also found in the bedroom, but it contained no money.

In addition to the blood found in the victim's bedroom, the police found blood stains on the sink and toilet in the victim's bathroom. A towel that appeared to be stained with blood was found on the floor outside the bathroom. There were five red stains that appeared to be blood on the wall of a staircase leading to the downstairs area of the victim's apartment. There were also two small stains that appeared to be blood on the front door of the apartment. There was no evidence that anything had occurred in the downstairs portion of the apartment. The police were unable to obtain any useful fingerprints inside the victim's apartment. The police did locate a receipt from a local Dollar General Store in an unused bedroom in the apartment. The receipt was dated May 10, 2010, and time-stamped at 8:46 p.m.

Mr. Harris testified that he was the victim's boyfriend and that he spent most nights at the victim's apartment. According to Mr. Harris, the victim would drink until she was intoxicated five or six days a week. Mr. Harris testified that when the victim got "full of them drinks" she would "get to raising hell, playing loud ass music, and cursing, and picking up things and throwing them." Mr. Harris stated that when the victim became belligerent, he would leave the apartment and return the next morning. Mr. Harris claimed that the victim had previously scratched his neck and slammed his thumb in a door but that those were the only times she had ever physically hurt him.

Mr. Harris testified that on May 10, 2010, he received some money and gave the victim fifty dollars. He and the victim ran some errands and did some shopping that morning before returning to the victim's apartment. Mr. Harris admitted that he "started getting high" while at the apartment and that he had smoked crack cocaine that day. Mr. Harris believed that the victim had also smoked cocaine that afternoon. The victim's friend, Michael Eubanks, came to the apartment and spent the afternoon with the victim and Mr. Harris. At some point, the victim left to purchase a fifth of whisky. Mr. Harris testified that when the victim returned, she drank "that whole fifth of [whisky] like it was water."

According to Mr. Harris, sometime around 4:30 p.m. "all hell broke loose" and the victim "started acting a fool and cussing" him and Mr. Eubanks, calling them "all kinds of b---hes and hoes." Mr. Harris testified that the victim took his cell phone and slung it at Mr. Eubanks, "hit[ting] him upside the face." Mr. Eubanks left shortly after that, around 5:00 p.m. A short time later, the victim kicked Mr. Harris out of the apartment. Mr. Harris told the victim that he would be back the next morning to get his clothes. Mr. Harris testified that there was no physical altercation between him and the victim and that he left when she told him to. Mr. Harris then went to a friend's house where he spent the night. The police later confirmed that Mr. Harris had stayed with a friend that night.

Mr. Eubanks testified at trial that he was a close friend of the victim and that he had been at her apartment all day on May 10, 2010. Mr. Eubanks admitted that he sold crack cocaine to Mr. Harris and that he and the victim would "just [get] high together." Mr. Eubanks claimed that he did not have any cocaine that day but had "smoked weed" instead. Mr. Eubanks testified that the victim would get "a little belligerent" and "might get loud" when she was drunk but that she had never assaulted him. Mr. Eubanks testified that he left the victim's apartment sometime after 5:00 p.m. Mr. Eubanks claimed that he did not leave because the victim threw a cell phone at him. According to Mr. Eubanks, the victim "tossed" the phone and "accidently hit [him] in the side of the head." Mr. Eubanks testified that he left because the victim was getting drunk but stated that she "was acting fine" when he left.

Mr. Harris testified that the victim did not have a phone but that she called him around 9:00 p.m. that night from a number he did not recognize. The victim asked Mr. Harris to come back to her apartment, but Mr. Harris said to her, "F--k you, b---h, I ain't coming back down there no more til in the morning [to] get my clothes." Mr. Harris testified that the victim continued to call him until 3:00 a.m. that morning, but he did not answer any more of her phone calls. The next morning, Mr. Harris went to the victim's apartment and found the screen door and front door both unlocked. Mr. Harris went into the apartment and saw that the bedroom light was on. He called for the victim and went upstairs to the bedroom when he got no response. Mr. Harris saw the victim's body and touched her chest to see if she was still alive. Mr. Harris testified that he believed the victim was dead so he ran outside and called 911. Mr. Harris waited outside for the police and then cooperated with their investigation.

Detective Johnny Crumby of the Metropolitan Nashville Police Department (MNPD) testified that he was the lead investigator in this case. Det. Crumby interviewed Mr. Harris and examined Mr. Harris's cell phone. Det. Crumby testified that on May 10, 2010, Mr. Harris received several phone calls between 9:22 and 9:55 p.m. from two phone numbers belonging to the Defendant. Det. Crumby also testified that based upon the Dollar General Store receipt found in the victim's second bedroom, he retrieved the store's video

surveillance footage in hopes of seeing who the victim was with that night. Instead, the footage showed the Defendant, wearing an orange reflective vest and with his hair styled in a unique manner, making a purchase alone. Mr. Harris testified that he had never met the Defendant, but the victim had talked about him. Mr. Eubanks testified that he had met the Defendant at the victim's apartment and that the victim "fed [the Defendant], housed him, [and] clothed him." Mr. Eubanks further testified that the victim let the Defendant stay at her apartment "when he didn't have [anywhere else] to go."

After the victim's murder, the Defendant fled to Missouri. The Defendant was eventually apprehended and returned to Tennessee. The Defendant waived his Miranda rights and agreed to speak with Det. Crumby. During their conversation, the Defendant asked Det. Crumby if "there [was] any such thing as self-defense in this state," and Det. Crumby responded that there was. The Defendant then told Det. Crumby that he had "been a victim of some things before" and that several years earlier he had been kidnapped and severely beaten by a woman. The Defendant told Det. Crumby that he did not "want that to happen a second time." The Defendant claimed that the victim was "very abusive to a number of people" and that she had "victimized" him in the past. The Defendant told Det. Crumby that he was taking a bath at the victim's apartment when she became very upset because he had accidentally used one of her towels and "then that's when the altercation began." The Defendant claimed that the victim "confronted [him] as soon as [he] got out of the bathtub" and that she "started throwing things and pulling that little knife." Det. Crumby asked the Defendant if he then "just defended [himself]," and the Defendant responded, "right." The Defendant told Det. Crumby that the evidence against him appeared "to be irrefutable."

Det. Crumby testified that he did not know who owned the knife found in the victim's bedroom. Mr. Harris testified that he had never seen the knife before and that he did not believe it belonged to the victim because she "wasn't the type to carry [a] weapon around with her." Additionally, the victim's daughter testified that her mother did not carry a knife or any other weapon. The victim's daughter also testified that her mother would carry her money either in her bra or in a change purse that she would sometimes place in her bra. Det. Crumby testified that he decided not to have any forensic tests performed on the blood and DNA evidence found in the victim's apartment after he interviewed the Defendant.

Dr. John B. Davis, an expert in forensic pathology, testified that he performed an autopsy on the victim. Dr. Davis determined that the victim was killed by a stab wound to the left side of her neck. The wound "cut through the carotid artery . . . and also damaged her esophagus." Dr. Davis testified that severing the carotid artery "would be very bloody" and that, due to the damage to the esophagus, the victim likely bled into the esophagus and swallowed "quite a bit of blood." Dr. Davis estimated that it took from a few minutes to

thirty minutes for the victim to die from the stab wound. Dr. Davis testified it was possible the victim could have survived had medical help been sought, but he noted that if no pressure was applied to the wound, the victim would have suffered "a relatively short death." A close examination of the wound showed that the knife had been twisted before it was removed.

The victim also suffered a small stab wound on her left arm and several incised wounds on her left arm, neck, and breasts. Dr. Davis testified that he found two incised wounds, approximately two inches long, on the underside of each of the victim's breasts. Dr. Davis testified that the victim's breasts were large and that the area where the wounds were located would not normally be exposed. Dr. Davis explained that the victim's shirt and bra would have to be removed and her breasts would have to be "lifted" in order for the incised wounds to be made at that location. Dr. Davis testified that he found no holes in the victim's clothing. The victim also suffered blunt force trauma injuries to the left side of her head and abrasions on her nose. Dr. Davis testified that these injuries were consistent with the victim having struck her head on a hard object or being struck in the head with a hard object. Dr. Davis further testified that it was possible the victim had been knocked unconscious.

Dr. Davis testified that the knife found in the victim's bedroom could have cause her stab and incised wounds, including the fatal wound to her neck. Dr. Davis opined that all of the victim's wounds were inflicted around the same time. Dr. Davis further opined that the fact that the blood was centered on the left side of the victim's bed and the floor was consistent with the victim having been lying down on the bed when she was stabbed in the neck. Dr. Davis noted that there were no defensive wounds on the victim's hands. The victim had both alcohol and cocaine in her blood at the time of her death. Dr. Davis testified that the victim's blood alcohol content was .28 percent, over three times the legal limit for driving in Tennessee.

Based upon the foregoing evidence, the jury convicted the Defendant of the lesser-included offense of second degree murder. Following a sentencing hearing, the trial court sentenced the Defendant as a Range II, multiple offender, to a sentence of forty years. The trial court placed great weight the Defendant's extensive criminal history which included prior convictions for burglary, rape, attempted rape, two aggravated assault convictions, reckless endangerment involving a deadly weapon, and three convictions for failure to register as a sex offender. The trial court also noted that the Defendant used a deadly weapon during the commission of the offense and that the Defendant was on probation when the offense was committed. The trial court concluded that these factors outweighed any possible mitigating factors.

ANALYSIS

-5-

*I. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain his conviction for second degree murder. The Defendant argues that the State failed to establish his identity as the perpetrator of the crime because it did not present any physical evidence to "directly implicate [him] in the victim's death." The Defendant also argues that the evidence established that he acted in self-defense. Alternatively, the Defendant argues that the evidence showed that he acted in a state of passion produced by adequate provocation; therefore, he was guilty of voluntary manslaughter rather than second degree murder. The State responds that the Defendant's identity as the perpetrator was established by circumstantial evidence and his statements to Det. Crumby. The State further responds that the evidence contradicted the Defendant's claim he acted in self-defense and that it was within the prerogative of the jury to reject his claim. The State also responds that the jurors were properly instructed on the difference between second degree murder and voluntary manslaughter and that the evidence was sufficient to support their verdict of second degree murder.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to the result of

the person's conduct "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). The identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010).

We conclude that the evidence was more than sufficient for the jury to conclude that the Defendant perpetrated the victim's murder. It was established at trial that the victim knew the Defendant and that she gave him food and clothes in addition to letting him stay at her apartment whenever he needed to. A receipt from a local Dollar General Store was found in the victim's apartment time-stamped for 8:56 p.m. on May 10, 2010. Video surveillance footage showed the Defendant, distinctively dressed, making a purchase at the Dollar General Store that night. The victim called Mr. Harris several times from phone numbers belonging to the Defendant between 9:22 and 9:55 p.m. that night. The Defendant fled the state the day after the victim's murder. The Defendant admitted to Det. Crumby that he had been in the victim's apartment on the night of May 10, 2010, and that an "altercation" had occurred between the two of them. When asked if he "just defended [himself]," the Defendant responded, "right." Based upon the foregoing evidence, we conclude that the Defendant's contention that the State failed to establish his identity as the perpetrator of the offense is without merit.

The Defendant next argues that the evidence established that he acted in self-defense. Tennessee law provides that a person may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

The Defendant told Det. Crumby that he got into an "altercation" with the victim after she discovered he had mistakenly used one of her bath towels. The Defendant claimed that the victim became very upset, started throwing things at him, and "pulling that little knife." However, the evidence presented at trial contradicted the Defendant's claim. Mr. Harris testified that he had never seen the knife found in the victim's bedroom, and both he and the victim's daughter testified that the victim did not carry a knife with her. Dr. Davis testified that the victim had no defensive wounds on her hands and that she suffered blunt force trauma to her head which possibly rendered her unconscious. Dr. Davis further testified that the victim suffered incised wounds on the underside of both her breasts which required that her shirt and bra be partially removed. Dr. Davis also opined, based upon the location of the

-7-

blood in the victim's bedroom, that the victim had been lying on the bed when she was fatally stabbed in the neck. Based upon the evidence presented at trial, it was well within the province of the jury to reject the Defendant's claim of self-defense. Accordingly, we conclude that this issue is without merit.

The Defendant also contends that the proof established that he committed voluntary manslaughter rather than second degree murder. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). The trial court instructed the jury on the lesser-included offense of voluntary manslaughter as well as the distinction between voluntary manslaughter and second degree murder. It is a jury question whether a knowing killing constituted second degree murder or voluntary manslaughter. State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001) (citing State v. Johnson, 909 S.W.2d, 461, 464 (Tenn. Crim. App. 1995)). Again, it was well within the province of the jury to reject the Defendant's claim that he killed the victim after she attacked him. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for second degree murder.

## II. Defendant's Prior Aggravated Assault Convictions

The Defendant contends that the trial court erred by ruling that his prior convictions for aggravated assault would have been admissible for impeachment purposes had he chosen to testify at trial. The Defendant argues that the probative value of these convictions on the Defendant's credibility was outweighed by their unfair prejudicial effect on the substantive issues due to the similarity between the aggravated assault convictions and the charged offense of first degree premeditated murder. The State responds that the Defendant's convictions for aggravated assault were sufficiently dissimilar to the indicted charge of first degree premeditated murder that their probative value as to credibility was not outweighed by their unfair prejudicial effect on the substantive issues.

Prior to trial, the State filed a notice of intent to use convictions for impeachment purposes listing ten of the Defendant's prior convictions. The Defendant filed a "motion for determination of convictions for impeachment" in response. The trial court held a pretrial hearing at which it reviewed all of the Defendant's prior convictions. The trial court limited the State to using only the Defendant's convictions for rape, attempted rape, and aggravated assault as impeachment evidence. Defense counsel raised the issue with the trial court again during the State's case-in-chief. Defense counsel objected to the use of the rape and attempted rape convictions given that the victim's shirt and bra had been partially removed, and the trial court altered its initial ruling to limit the State to using only the Defendant's convictions for aggravated assault. At no point did the Defendant object to the use of the

aggravated assault convictions on the grounds that they were substantially similar to the charged offense. The Defendant subsequently decided not to testify at trial.

Tennessee Rule of Evidence 609 allows a witness to be impeached by evidence of a prior criminal conviction so long as the convicting offense was a felony or a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a). Evidence of a conviction is not admissible if "a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution." Tenn. R. Evid. 609(b). When the witness to be impeached is the defendant in a criminal prosecution, "the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). A trial court's ruling on the admissibility of a prior conviction for impeachment purposes is reviewed on appeal under an abuse of discretion standard. State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003).

Violent felonies "reflect on the moral character of a witness" and are "not usually without probative value." State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996). Additionally, the "mere fact a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997). However, there is a danger "that jurors will erroneously utilize [an] impeaching conviction as propensity evidence" when the impeaching conviction is "substantially similar to the crime for which the defendant is being tried." State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999). Here, there was nothing in the record to suggest that the Defendant's prior convictions for aggravated assault were substantially similar to the charged offense of first degree premeditated murder in any way except for the fact that each offense was a crime involving violence. Absent any evidence that the crimes were substantially similar, we will not overturn the trial court's ruling. See State v. Burl Lakins, No. 32, 1991 WL 84947, at *3 (Tenn. Crim. App. May 24, 1991) (holding that a prior conviction for second degree murder could be used to impeach the defendant in a prosecution for aggravated assault). Therefore, we conclude that this issue is without merit.

*III. Sentencing*

The Defendant contends that the trial court erred by imposing a forty-year sentence, the maximum possible for a Range II, multiple offender. The Defendant argues that the trial court failed to apply several mitigating factors and that the sentence was greater than that deserved for the offense. The State responds that the trial court imposed a sentence

consistent with the principles and purposes of the Criminal Sentencing Reform Act of 1989 (Sentencing Reform Act).

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W.3d 682, 709 (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations:"

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. §40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. §40-35-103(5).

Here, the trial court imposed the maximum sentence within the appropriate statutory range. The trial court entered a detailed sentencing order examining both the State's

proposed enhancement factors and the Defendant's proposed mitigating factors. The trial court placed great weight on the fact that the Defendant had an extensive history of criminal convictions including convictions for burglary, rape, attempted rape, aggravated assault, reckless endangerment involving a deadly weapon, and failure to register as a sex offender. The trial court also considered the fact that the Defendant was on probation when he committed this offense and that he used a deadly weapon in the commission of the offense. The trial court examined all of the Defendant's proposed mitigating factors but found that only one mitigating factor applied, that the Defendant had attempted to be a model inmate. The trial court concluded that this factor was greatly outweighed by the enhancement factors. The record before us shows that the trial court fully considered the purposes and principles of the Sentencing Reform Act. Accordingly, we affirm the trial court's sentencing decision.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE